22CA0372 Peo v Schwenk 08-22-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA0372 El Paso County District Court No. 20CR5016 Honorable Eric Bentley, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Daniel Caleb Schwenk, Defendant-Appellant. JUDGMENT AFFIRMED Division II Opinion by JUDGE FOX Grove and Sullivan, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 22, 2024 Philip J. Weiser, Attorney General, Alejandro Sorg, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Sean James Lacefield, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Daniel Caleb Schwenk, appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree assault and menacing based on evidence that he shot the victim, G.P. We affirm. I. Background ¶ 2 Evidence at trial revealed that a shooting occurred in a hotel known for criminal activity. Schwenk and the victim — both hotel regulars — had a contentious history, and by all accounts did not get along. Schwenk apparently “robbed” the victim, and the victim wanted his “stuff” back. The victim had apparently hit Schwenk on the head with a gun at some point before the shooting. And shortly before the incident, Schwenk texted a friend that he feared he might get shot. ¶ 3 On the day in question, hotel surveillance footage showed Schwenk ascending a hotel staircase carrying what appeared to be a long gun concealed by a covering. A witness who knew Schwenk testified that he knocked on her second-story hotel room door while holding a shotgun. She did not answer. The witness testified that she watched from her hotel door peephole as Schwenk turned down 
2 the hall and walked away. As he did so, the victim emerged from another room into the hallway, and the pair began arguing. The witness described the victim verbally “picking on” Schwenk, though she never saw the victim “pull a gun.”
1 But she could not say for certain whether the victim was armed, and the pair moved out of her sightline right before the shooting. ¶ 4 Surveillance footage depicted Schwenk, at the top of a staircase landing, firing a shotgun at a target outside the frame. Surveillance Footage View 1 The victim was accompanied by a friend who apparently grabbed an AR-15 style rifle from the victim’s room immediately after the incident. 
3 Schwenk then ran down the staircase — past a ground-level exit door on the staircase’s midpoint landing — to the hotel’s lower level. Meanwhile, bystanders ran to the victim, who suffered a gunshot wound to the chest and arm. ¶ 5 Schwenk was captured on video fleeing the scene; officers apprehended him at another location. A shotgun was later recovered from a storage room on the hotel’s lower level. ¶ 6 The prosecution charged Schwenk with attempted second degree murder, first degree assault, second degree assault, menacing, and possession of a weapon by a previous offender (POWPO). The prosecution later added habitual criminal counts based on Schwenk’s four prior felony convictions. The POWPO charge was bifurcated, and the prosecution dismissed the second degree assault charge during trial. Accordingly, the jury considered only the attempted second degree murder, first degree assault, and menacing charges. ¶ 7 The prosecution theorized that Schwenk shot the victim because he wanted to “make a point” and was tired of being “pushed around.” Schwenk asserted self-defense. 
4 ¶ 8 The jury could not reach a verdict on the attempted murder count, which the prosecution then dismissed. The jury found Schwenk guilty of first degree assault and menacing. It also found several crime of violence sentence enhancers proven, including that Schwenk used a deadly weapon and that the assault resulted in serious bodily injury. ¶ 9 After a bifurcated hearing, the court found that the prosecution proved the habitual criminal counts beyond a reasonable doubt. Concluding that the habitual sentence for the assault conviction would be constitutionally disproportionate, the court sentenced Schwenk to twenty years in the Department of Corrections’ custody. The court imposed an initial award of restitution for $71,186.21 plus expenses for the victim’s future treatment. ¶ 10 On appeal, Schwenk asserts two trial errors and appeals the district court’s restitution order. II. Trial Errors ¶ 11 Schwenk claims that two errors violated his right to a fair trial: (1) the prosecutor committed reversible misconduct during voir dire 
5 and closing arguments; and (2) the court erroneously excluded impeachment evidence against the victim, who did not testify but was a hearsay declarant. While we agree that several errors occurred, none prejudiced Schwenk such that reversal is required. A. Prosecutorial Misconduct ¶ 12 Schwenk first claims that the prosecutor committed reversible misconduct by indoctrinating the jury, obtaining commitments to convict, using analogies to describe the burden of proof, and misstating the law of self-defense. While we do not condone several of the prosecutor’s challenged actions, we conclude that none of the claims amounted to reversible misconduct. 1. Standard of Review ¶ 13 “While a prosecutor can use every legitimate means to bring about a just conviction, [he] has a duty to avoid using improper methods designed to obtain an unjust result.” Domingo-Gomez v. People, 125 P.3d 1043, 1048 (Colo. 2005). We engage in a two-step analysis when reviewing claims of prosecutorial misconduct. Wend v. People, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor’s conduct was improper based on the 
6 totality of the circumstances. Id. Second, we decide whether such actions warrant reversal under the proper standard of review. Id. ¶ 14 We reverse preserved claims of constitutional dimension unless the error was harmless beyond a reasonable doubt. Hagos v. People, 2012 CO 63, ¶ 11. We review preserved nonconstitutional trial errors for harmless error. Id. at ¶ 12. ¶ 15 We review unpreserved claims of prosecutorial misconduct for plain error, id. at ¶ 14, which, to warrant reversal, must be obvious, substantial, and so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction, People v. Smith, 2018 CO 33, ¶ 24. An error is obvious if it contravenes a clear statutory command, a well-settled legal principle, or established Colorado case law. People v. Crabtree, 2024 CO 40M, ¶ 42. Whether an error is obvious is measured at the time the error is made. Id. at ¶¶ 8, 72. ¶ 16 “Prosecutorial misconduct in closing argument rarely constitutes plain error.” People v. Smalley, 2015 COA 140, ¶ 37; see also Hagos, ¶ 23 (reversals on plain error review “must be rare to maintain adequate motivation among trial participants to seek a 
7 fair and accurate trial the first time”). “Only prosecutorial misconduct that is ‘flagrantly, glaringly, or tremendously improper’ warrants reversal under the plain error test.” People v. Duncan, 2023 COA 122, ¶ 33 (quoting Hagos, ¶ 14). Thus, even if improper, a prosecutor’s comments during closing argument do not necessarily warrant reversal if the combined prejudicial impact of the statements does not cast serious doubt on the reliability of the conviction. People v. Nardine, 2016 COA 85, ¶ 66. 2. Indoctrination and Precommitment ¶ 17 Schwenk first claims that the prosecutor committed reversible misconduct by indoctrinating the jury with the prosecution’s theory of the case and obtaining commitments to convict. We disagree. ¶ 18 During voir dire, the prosecutor addressed the theme of sympathetic and unsympathetic victims. He first used an example of Peyton Manning — a widely respected public figure and former Denver Broncos quarterback — being punched in the face. He then contrasted that example with an obnoxious fan of the Las Vegas Raiders — a Denver Broncos rival — being punched in the face. The prosecutor asked questions about whether the Raiders fan was 
8 a victim of a crime, even if the jury did not “feel bad” for him. The prosecutor continued with the “extreme example” of a registered sex offender and posed a similar question. ¶ 19 The prosecutor then probed the jurors’ opinions of victims who choose not to testify. He modified the Raiders fan hypothetical, proposing that the entire assault was captured on video and then subsequently taken to trial. The prosecutor asked, under those circumstances, “Who would you expect to come in and testify about this assault that happened?” After soliciting a few responses, the prosecutor asked, I’ve got the video footage that shows this whole thing transpired. Everything that you would want to see about. And let’s say the guy [who] got punched in the face didn’t testify. Would you still be able to convict him based on all the other evidence if it convinced you beyond a reasonable doubt that he was indeed punched in the face? He then reversed the question, asking whether someone would be unable to convict unless the victim testified. ¶ 20 During rebuttal closing argument, the prosecutor tied the Raiders hypothetical to the victim in this case, acknowledging that he was not particularly sympathetic: 
9 And I’m not going to get up here and tell you that [the victim] is a good guy, that [he] is a guy you should feel bad for, that [he] is anything other than that Raiders fan we were talking about during jury selection. But you know what? He’s still a human being. He still is entitled to the protections of our laws[.] And that does not matter who you are or where you come from or what you’ve done. He is still the victim of [Schwenk’s conduct]. ¶ 21 Defense counsel never objected. Because the claimed error is unpreserved, we reverse only for plain error. See Hagos, ¶ 14. ¶ 22 Voir dire allows counsel to inquire whether potential jurors hold any biases that would prevent the defendant from receiving a fair trial. People v. Wilson, 2013 COA 75, ¶ 12. Crim. P. 24(a)(3) grants trial courts discretion to limit improper voir dire. Trial courts may limit voir dire that instructs the jurors on a party’s theory of the case. See Wilson, ¶ 13; see also People v. Shockey, 2023 COA 121, ¶ 71 (Richman, J., concurring in part and dissenting in part). ¶ 23 We conclude that any error in the trial court’s failure to intervene in the prosecutor’s questioning was not plain because, even if improper, it did not amount to an obvious error. See People v. Vigil, 251 P.3d 442, 447 (Colo. App. 2010) (under the plain error 
10 standard, an appellate court need not decide whether the trial court actually erred if the alleged error was not obvious). While settled Colorado case law at the time of trial prohibited voir dire that teaches the jury a party’s theory of the case, this was not obviously one of those circumstances. Schwenk argues that the Raiders hypothetical taught the jurors the prosecution’s theory because it had commonalities with the case, including an assault and an unsympathetic victim. But it was clear, in context, that the prosecutor was trying to identify whether the jurors could decide the case based on the facts and the law before them, and not on whether the victim was sympathetic or unsympathetic — an aim that aligns with the very purpose of voir dire. Wilson, ¶ 12. ¶ 24 Schwenk’s argument that the hypothetical precommitted the jurors to a guilty verdict is equally unavailing. Even if settled Colorado authority prohibited such “precommitment” questions at the time of trial, we do not read the prosecutor’s questions, in context, as doing so. Instead, the prosecutor created a hypothetical assault captured on film to determine if any of the jurors held a bias against nontestifying victims. See id. And the prosecutor 
11 tempered the hypothetical with the caveat that all the other evidence presented would have to convince the jurors of guilt beyond a reasonable doubt. In that way, the prosecutor’s question — while perhaps inartful — is distinguishable from one requiring the jurors to commit to a guilty verdict before hearing the evidence. 3. Burden of Proof Analogies ¶ 25 Next, Schwenk contends that the prosecutor committed reversible misconduct during voir dire by using analogies that “trivialized” the burden of proof. ¶ 26 The prosecutor told the jury that he would be using the same Raiders fan example to discuss the burden of proof. He asked a juror, hypothetically, if the prosecution presented video evidence and testimony from the victim, but the “defendant” took the stand and argued that aliens were controlling his brain, whether that would create a reasonable doubt. Defense counsel objected that the analogy trivialized the burden of proof. The court ruled, “I will allow the alien example.” ¶ 27 The prosecutor then invoked the now notorious home purchase analogy. See Tibbels v. People, 2022 CO 1, ¶¶ 50-53. He 
12 described the sale of a perfect house in a great neighborhood in the right price range, and whether a juror would consider that purchase a matter of importance to himself. He then asked whether a wine stain on the carpet or a crack in the kitchen window would cause the jurors to hesitate in purchasing the home. Predictably, the jurors answered that they would not hesitate to purchase a perfect house with either of those cosmetic problems. The prosecutor then modified the analogy, asking whether a juror would hesitate in buying a home that had black mold “all over” behind the bathroom wall. The juror answered that black mold would cause her to hesitate because it “reveals the potential of a more significant problem.” Defense counsel did not object to the home purchase analogy. ¶ 28 Because defense counsel objected to the first analogy, we assume without deciding that the alleged error implicates Schwenk’s due process rights and apply the constitutional harmless error standard of reversal. See id. at ¶ 23; see also Hagos, ¶ 11. Because defense counsel did not object to the second analogy, we 
13 conclude that the claim of error is unpreserved and review for plain error. See Hagos, ¶ 14. ¶ 29 Analogies that attempt to illustrate what “beyond a reasonable doubt” means are “perilous and unhelpful.” People v. Vialpando, 2022 CO 28, ¶ 41; see also Tibbels, ¶ 25; People v. Sanders, 2022 COA 47, ¶ 48; People v. Camarigg, 2017 COA 115M, ¶¶ 44-47. By now, trial courts and prosecutors should all be on notice that using these illustrations is fraught. ¶ 30 But in this case, we perceive no reversible error. Contrary to Schwenk’s view, the prosecutor’s comments (while certainly inartful and at times confusing) were not on par with the trial court’s problematic remarks in Tibbels. Importantly, the prosecutor did not occupy the same role as the court (i.e., setting forth the law the jury must apply). The trial court emphasized to the jury that, “[w]hile the attorneys may comment on some of the rules of law, you must follow the instructions I give you.” The court gave the jury the correct definition of “reasonable doubt,” and it did not undermine those definitions, unlike in Tibbels, ¶ 9. We presume the jury 
14 followed those instructions. See Bondsteel v. People, 2019 CO 26, ¶ 62. ¶ 31 Further, the prosecutor’s challenged statements were relatively brief in the context of the entire trial; in fact, they were made only during voir dire. People v. Cevallos-Acosta, 140 P.3d 116, 124 (Colo. App. 2005) (finding no error where the prosecutor’s discussion of reasonable doubt was brief). The prosecutor did not invoke the alien or home purchase analogy during closing argument. See Vialpando, ¶ 41 (concluding that a prosecutor’s use of a burden of proof analogy did not prejudice the defendant where the reference was isolated to voir dire). ¶ 32 For these reasons, we conclude that any error in the prosecutor’s use of the alien analogy was harmless beyond a reasonable doubt. ¶ 33 In addition to those identified above, two additional considerations inform our conclusion that no plain error occurred as to the home purchase analogy. First, the prosecutor’s use of this analogy was not obvious misconduct. We measure the obviousness of an error at the time it occurred. Crabtree, ¶¶ 8, 72. At the time 
15 of Schwenk’s trial, divisions of this court disagreed about whether the court’s use of analogies to illustrate the beyond a reasonable doubt standard lowered the prosecution’s burden of proof. Compare People v. Knobee, 2020 COA 7, ¶ 34 (concluding that a court’s analogy lowered prosecution’s burden of proof) (cert. granted June 29, 2020) (cert. vacated and case dismissed due to respondent’s death Sept. 9, 2021), with People v. Tibbels, 2019 COA 175, ¶ 35 (concluding that a court’s analogy did not lower prosecution’s burden of proof), rev’d, 2022 CO 1, ¶ 53, and People v. Avila, 2019 COA 145, ¶ 46 (same), overruled by Tibbels, 2022 CO 1, ¶ 53. The Colorado Supreme Court later settled the question of whether a trial court’s use of illustrations lowers the prosecution’s burden of proof in Tibbels, which was decided after Schwenk’s August 2021 trial. But at the time of Schwenk’s trial, no published Colorado case established that a prosecutor’s use of an analogy to describe the burden of proof constituted reversible misconduct. ¶ 34 Second, defense counsel’s failure to object to the comments demonstrates counsel’s belief that the live arguments, despite their 
16 appearance in a cold record, were not overly damaging. See Domingo-Gomez, 125 P.3d at 1054. 4. Misstating the Law ¶ 35 Schwenk next argues that the prosecutor committed reversible misconduct during rebuttal closing argument by inaccurately representing the duty (or lack thereof) to retreat. While we agree with Schwenk that the prosecutor erred, and the error was obvious, we conclude that it was not substantial. ¶ 36 A person may use physical force to defend himself “from what he reasonably believes to be the use or imminent use of unlawful physical force,” and he may use “a degree of force which he reasonably believes to be necessary for that purpose.” § 18-1-
704(1), C.R.S. 2023. Only initial aggressors have a duty to retreat before using force in self-defense. People v. Monroe, 2020 CO 67, ¶ 19. Prosecutors may not argue that a defendant is barred from acting in self-defense unless he first retreats from the encounter. Id. at ¶ 20. Similarly, prosecutors cannot argue that a defendant’s failure to retreat undermines the reasonableness of his use of force. Id. at ¶ 29. Such arguments pose a significant risk of confusing the 
17 jury. Id. at ¶ 32 (citing CRE 403). However, prosecutors may assert these arguments when related to the defendant’s status as an initial aggressor. See id. at ¶ 28; see also People v. Martinez, 224 P.3d 1026, 1033 (Colo. App. 2009). ¶ 37 During rebuttal closing argument, the prosecutor argued that bringing a weapon to a hotel where the victim lived undermined Schwenk’s claim of self-defense. The prosecutor continued, “But it’s more than that. And indeed the Defendant’s own actions bear this out that this is not a case of self-defense.” The prosecutor then replayed the surveillance footage for the jury before saying, Now, what else do we see right here? There’s a door (indicated). There’s an exit. There’s a means of escape. [The victim] is in this hallway (indicated). [The victim], unarmed, making no threats, is in a separate hallway . . . . There’s a different door that separates that. If . . . Schwenk is in any form of danger, does he engage [the victim]? No. He only does that if he’s intending to cause serious bodily injury or death. He doesn’t make a movement towards this open door. Moreover, when he fires the shot because he’s supposedly so scared for his own safety, does he hit the first entrance? No. What does he do? He descends the stairs. He hides the shotgun . . . . 
18 Defense counsel did not object. Schwenk now argues that the prosecutor improperly suggested that Schwenk had a duty to retreat. ¶ 38 Prosecutors may not misstate the law. Monroe, ¶ 16. When a court, upon proper objection, fails to correct the prosecutor’s misstatement of law, the court improperly permits the jury to adopt the prosecutor’s incorrect version of the law. Id. But here, where defense counsel did not object, we review for plain error. See Hagos, ¶ 14. ¶ 39 We conclude that the prosecutor misstated the law and the error was sufficiently obvious that the “trial judge should [have been] able to avoid it without benefit of objection.” Crabtree, ¶ 42 (citation omitted). In Monroe, ¶ 29, a case announced over a year before Schwenk’s trial, the Colorado Supreme Court unequivocally prohibited prosecutors from using a defendant’s failure to retreat to argue that his use of force was unreasonable. The prosecutor’s suggestion that Schwenk engaged the victim instead of leaving the encounter reflected on whether he reasonably perceived a threat or used a reasonable degree of force to defend himself. This is 
19 precisely the type of improper argument the Monroe court categorically prohibited. ¶ 40 While we recognize that Schwenk’s status as an initial aggressor was contested, and that the jury was given an initial aggressor instruction, we do not believe that the challenged argument, in context, had anything to do with that instruction. The prosecutor did not preface the argument by saying Schwenk initiated the confrontation, and thus had to retreat before using force. Instead, the prosecutor introduced the argument as an additional reason why Schwenk’s conduct disqualified him from asserting self-defense. The prosecutor argued that if Schwenk perceived danger, he would have used the exit to leave the confrontation. The only inference the jury could have drawn from that argument was that if Schwenk’s retreat was “possible but not pursued,” then Schwenk must not have “actually perceived a threat,” conditioning the reasonableness of the use of force on flight. Id. at ¶ 30. 
20 ¶ 41 Because well-settled Colorado case law prohibited the prosecutor’s conduct at the time of trial, the error was obvious. The court should have recognized the error and intervened. ¶ 42 Nevertheless, we conclude that the error was not substantial and did not so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of Schwenk’s conviction. Smith, ¶ 24. ¶ 43 First, the misstatement of law was brief and isolated. The prosecutor made the misstatement once during rebuttal closing. The improper portion of argument spanned about ten lines of text in the context of a closing argument that spanned fourteen pages. See People v. Cuellar, 2023 COA 20, ¶¶ 75, 83. True, the misstatement was one of the last things the jury heard before it entered into deliberations. See Domingo-Gomez, 125 P.3d at 1052 (“Rebuttal closing is the last thing a juror hears from counsel before deliberating, and it is therefore foremost in their thoughts.”). But the prosecutor addressed two other substantive topics in detail after the misstatement: Schwenk’s flight from the hotel and his subsequent incriminating statements recorded on jail calls. 
21 ¶ 44 This case is distinguishable from Monroe in that the prosecutor’s arguments there were numerous and more directly related to the defendant’s failure to retreat than the arguments in this case. Specifically, the prosecutor in Monroe referred to a duty to retreat five times during closing argument, each time directing the jury to consider the defendant’s failure to retreat as relevant to whether she reasonably believed she needed to act in self-defense. Monroe, ¶¶ 36-37. Here, the prosecutor only raised this argument once over the course of the entire trial and did not expressly reference a duty to retreat at all. See People v. Liebler, 2022 COA 21, ¶ 51 (whether prosecutorial misconduct was repeated is relevant to whether reversal is warranted). ¶ 45 Further, the trial court properly instructed the jury on the law of self-defense, namely, that a person is authorized to use physical force without first retreating when the conditions of self-defense are met. The prosecutor repeated that correct statement of law during his initial closing argument. The court also instructed the jury that “[w]hile the attorneys may comment on some of the rules of law, you must follow the instructions I give you,” and that “[y]our decision 
22 must be made by applying the rules of law that I give you to the evidence presented at trial.” We presume the jury understood and followed these instructions. See Bondsteel, ¶ 62. ¶ 46 In contrast, the Monroe court repeatedly overruled objections to the prosecutor’s duty-to-retreat arguments and instructed the jury that it could consider the defendant’s failure to retreat as relevant to whether she actually believed she faced an imminent use of unlawful force. Monroe, ¶¶ 9-11, 37. As a result of the court’s actions and instruction, there was “a significant risk that the jury convicted [the defendant] because it erroneously believed that her failure to retreat necessarily negated the reasonableness of her use of force.” Id. at ¶ 37. Such a risk was not present here, where the court did not indicate to the jury — through overruled objections or instructions to the jury — that Schwenk had a duty to retreat. Instead, the court was presented with no objection on the issue, and it correctly instructed the jury that Schwenk had no duty to retreat. ¶ 47 In conclusion, Schwenk is correct that at least some of the prosecutor’s challenged conduct was improper. But none of the 
23 alleged errors so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. See People v. Walker, 2022 COA 15, ¶¶ 28, 49. B. Impeachment ¶ 48 Schwenk next claims that the trial court erred by failing to take judicial notice of the victim’s felony convictions offered to impeach him because, though he did not testify, he made out-of-
court statements that were admitted during trial through an officer’s body camera footage. While the People admit that the trial court erred, they argue that any error was not reversible. We agree. 1. Additional Background ¶ 49 A body camera documented the responding officer’s aid to the victim. The prosecution offered her body camera footage into evidence, to which the defense objected on relevance and CRE 403 grounds. The trial court overruled the objection and admitted the exhibit. ¶ 50 The footage depicted the victim lying on the ground, anguishing in pain. During the video, he made the following statements: • “I’m going to die” and “I’m dying”; 
24 • “I don’t want to die”; • “Just kill me”; and • “I want my girl.”
2 The victim also provided some basic identifying information to the paramedics, and when a bystander said that the firearm that Schwenk, (identified as “Smiley”), used was a “.22,” the victim cried out, “Shotgun!” Later during trial, a witness testified that the victim said, “Don’t do it, don’t do it” immediately before he was shot. ¶ 51 During the defense’s case in chief, counsel asked the trial court to take judicial notice of the fact that the victim was then incarcerated; the prosecution did not object. Outside the jury’s presence, defense counsel further requested that the court take judicial notice of the victim’s felony convictions, offered as impeachment evidence based on his status as a hearsay declarant. The court asked defense counsel to provide legal authority to support the request, and while both parties provided pertinent 2 In fairness to Schwenk, we recount each of the victim’s statements here, though we recognize that several were probably not hearsay within the meaning of CRE 806 because they were not offered for the truth of the matter asserted. 
25 arguments, neither supplied the court with the relevant authority allowing impeachment of a hearsay declarant. After some discussion about whether the statements constituted nonhearsay or, alternatively, hearsay falling under an exception to the general ban, the court noted that the victim only made statements as to undisputed facts. The court then denied the defense’s request. 2. Preservation and Standard of Review ¶ 52 We review a trial court’s rulings on the admissibility of evidence for an abuse of discretion. People v. Brown, 2022 COA 19, ¶ 57. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or where it applies an incorrect legal standard. People v. Rodriguez, 2022 COA 98, ¶ 12. We review preserved evidentiary errors for harmless error and unpreserved claims for plain error. Hagos, ¶¶ 12, 14. ¶ 53 Defense counsel asked the trial court to take judicial notice of the victim’s felony convictions, asserting that the credibility of hearsay declarants can be impeached. While counsel did not cite CRE 806, section 13-90-101, C.R.S. 2023, or any binding authority applying those provisions, we conclude that the evidentiary 
26 argument is preserved. See Martinez v. People, 2015 CO 16, ¶ 14 (we do not require talismanic language to preserve an argument for appeal). ¶ 54 For the first time on appeal, Schwenk asserts that this error violated his rights under the Confrontation Clauses of the United States and Colorado constitutions. However, on these facts, defense counsel’s unsupported assertion that the credibility of hearsay declarants can be attacked was insufficient to preserve Schwenk’s confrontation argument. See id. at ¶¶ 14-15 (a party must present the trial court with an adequate opportunity to make findings of fact and conclusions of law on the issue and objections that fail to draw the court’s attention to the asserted error are insufficient). Thus, we will apply plain error review to Schwenk’s constitutional claim.
3 3. Application ¶ 55 The Confrontation Clause guarantees a criminal defendant the right “to be confronted with the witnesses against him.” U.S. Const. 3 Though we apply plain error review to Schwenk’s confrontation argument, for the reasons discussed below, his claim would not result in reversible error even if preserved. 
27 amend. VI; see also Colo. Const. art. II, § 16; Campbell v. People, 2020 CO 49, ¶ 22. CRE 806 provides that when a hearsay statement is admitted into evidence, the declarant’s credibility may be attacked. The People admit that the trial court erred by declining to take judicial notice of the victim’s felony convictions. Thus, we must determine whether the error was reversible and conclude that it was not. ¶ 56 Reversal is not warranted here under any standard because the claimed error did not prejudice Schwenk. The victim’s statements were, to put it mildly, of limited probative value. Aside from contemplating his own death and asking for his “girl,” the victim merely asked Schwenk not to shoot him (“Don’t do it”) and corrected a witness’s misidentification of the type of gun that Schwenk used to shoot him (“Shotgun!”). ¶ 57 In this self-defense case, the parties did not dispute that Schwenk shot the victim with a shotgun. Indeed, surveillance footage documented him firing a shotgun in the victim’s direction. Thus, the victim’s credibility on this point was not at issue, and the jurors did not have to believe anything the victim said in order to 
28 answer the question they were called to resolve: whether Schwenk acted in self-defense. ¶ 58 We are ultimately unpersuaded by Schwenk’s theory of harm that the jurors, if properly instructed on the victim’s felony convictions, could have used that knowledge to discredit the victim’s command, “don’t do it,” and view it as a dishonest attempt to misrepresent the circumstances leading up to the shooting to anyone who might be listening. Even if the evidence had shown that the victim was armed and pointed a gun at Schwenk, that circumstance could coexist with the victim’s command that Schwenk not shoot. III. Restitution ¶ 59 Finally, Schwenk argues that the restitution order must be vacated because the prosecution’s request was untimely. ¶ 60 The restitution statute provides that “[e]very order of conviction of a felony [or] misdemeanor . . . shall include consideration of restitution.” § 18-1.3-603(1), C.R.S. 2023. The statute then identifies four types of restitution orders trial courts may enter. People v. Weeks, 2021 CO 75, ¶ 3. One of these options 
29 — found in subsection (1)(b) of the statute — is an “order that the defendant is obligated to pay restitution, but that the specific amount of restitution shall be determined within the ninety-one days immediately following the order of conviction, unless good cause is shown for extending the time period by which the restitution amount shall be determined.” § 18-1.3-603(1)(b). ¶ 61 At Schwenk’s January 18 sentencing, the court ordered restitution in an amount to be determined within ninety-one days. The court instructed the prosecution to submit a request within forty-two days, giving the defense twenty-one days to object. The prosecution filed a draft order containing the restitution amount on February 28. The court adopted the order on March 22 — approximately sixty-three days after Schwenk’s sentencing. Thus, whether the court had authority to enter the restitution order is not at issue here. ¶ 62 Instead, Schwenk asserts that the prosecution failed to comply with its statutorily imposed obligations, requiring vacatur of the order. “[T]he restitution statute requires the prosecution to exercise reasonable diligence to determine the amount of restitution and 
30 present it to the court at or before the sentencing hearing.” People v. Brassill, 2024 COA 19, ¶ 30; see also § 18-1.3-603(2)(a). But a prosecutor’s failure to comply with that requirement does not deprive the court of authority to impose restitution. Brassill, ¶¶ 56-
61. District courts have broad discretion in managing their dockets through scheduling orders. See id. at ¶¶ 17, 52. ¶ 63 While the prosecution failed to provide restitution information at sentencing, the court established a reasonable plan allowing each party to weigh in on the issue before it lost authority to impose restitution. It ordered restitution, according to that plan, well before the deadline passed. And courts and prosecutors alike are now on notice of a prosecutor’s duty to use diligent efforts to present restitution information at sentencing. Id. at ¶ 63. Thus, the court acted within its discretion by awarding restitution 
31 notwithstanding the prosecutor’s failure to provide pertinent restitution information at sentencing.
4 IV. Disposition ¶ 64 The judgment is affirmed. JUDGE GROVE and JUDGE SULLIVAN concur. 4 Because the division’s holding in People v. Brassill, 2024 COA 19, is dispositive, we need not address the People’s contention that Schwenk waived his objection to the restitution order. And to the extent that the People failed to raise a harmless error argument on appeal, we do not resolve the issue on that basis because we may affirm on any ground supported by the record. People v. Aarness, 150 P.3d 1271, 1277 (Colo. 2006).